IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHWESTERN DIVISION

DIANA ENGLAND,                      )
                                    )
              Plaintiff,            )
                                    )
      v.                            )  Case No.
                                    )  08-5022-CV-SW-REL-SSA
MICHAEL J. ASTRUE, Commissioner     )
of Social Security,                 )
                                    )
              Defendant.            )

### ORDER REVERSING THE DECISION OF THE COMMISSIONER, AND GRANTING PLAINTIFF'S MOTION TO REMAND

Plaintiff Diana England seeks review of the final decision
of the Commissioner of Social Security denying plaintiff's
application for disability benefits under Title II of the Social
Security Act ("the Act").  Plaintiff argues that the ALJ erred
(1) in finding that plaintiff's back impairment is not severe,
(2) in formulating a residual functional capacity that is not
supported by the evidence, (3) in failing to order a consultative
mental health examination or in failing to recontact the treating
source, and (4) in failing to properly assess plaintiff's
credibility.  I find that the ALJ erred in failing to support her
findings and in failing to resolve conflicts in the record.
Therefore, plaintiff's motion to reverse and remand will be
granted.

### I.    BACKGROUND

On July 12, 2005, plaintiff applied for disability benefits
alleging that she had been disabled since June 24, 2005.

Plaintiff's disability stems from a deformed foot, back pain, and depression. Plaintiff's application was denied on October 6, 2005. On March 8, 2007, a hearing was held before an Administrative Law Judge. On April 4, 2007, the ALJ found that plaintiff was not under a "disability" as defined in the Act. On January 5, 2008, the Appeals Council denied plaintiff's request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II. STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into

2

consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

### III. BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving she is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that she is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other

3

type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1. Is the claimant performing substantial gainful activity?

        Yes = not disabled.
        No = go to next step.

2. Does the claimant have a severe impairment or a combination of impairments which significantly limits her ability to do basic work activities?

        No = not disabled.
        Yes = go to next step.

3. Does the impairment meet or equal a listed impairment in Appendix 1?

        Yes = disabled.
        No = go to next step.

4. Does the impairment prevent the claimant from doing past relevant work?

        No = not disabled.
        Yes = go to next step where burden shifts to Commissioner.

4

5.   Does the impairment prevent the claimant from doing any other work?

> Yes = disabled.
> No = not disabled.

## IV.   *THE RECORD*

The record consists of the testimony of plaintiff and vocational expert Terri D. Crawford, in addition to documentary evidence admitted at the hearing.

## A.   *ADMINISTRATIVE REPORTS*

The record contains the following administrative reports:

## Earnings Record

The record shows that plaintiff earned the following income from 1976 through 2006:

| Year | Income | Year | Income |
|------|--------|------|--------|
| 1976 | $     12.67 | 1992 | $ 3,976.65 |
| 1977 | 915.40 | 1993 | 8,112.01 |
| 1978 | 893.29 | 1994 | 7,164.63 |
| 1979 | 1,806.35 | 1995 | 11,593.07 |
| 1980 | 1,182.65 | 1996 | 8,675.21 |
| 1981 | 2,568.17 | 1997 | 18,769.70 |
| 1982 | 2,703.14 | 1998 | 22,376.20 |
| 1983 | 4,525.64 | 1999 | 312.00 |
| 1984 | 3,505.76 | 2000 | 1,992.24 |
| 1985 | 2,153.27 | 2001 | 0.00 |
| 1986 | 2,033.34 | 2002 | 2,795.94 |
| 1987 | 507.50 | 2003 | 2,910.70 |

5

| 1988 | 0.00 | 2004 | 7,019.65 |
|---|---|---|---|
| 1989 | 0.00 | 2005 | 0.00 |
| 1990 | 907.50 | 2006 | 0.00 |
| 1991 | 2,544.15 | | |

(Tr. at 48).

**Work Activity Report**

In a Work Activity Report completed on July 18, 2005, plaintiff reported that she works about 20 hours per week at the Burwick Pre-School and Day Care (Tr. at 66). Plaintiff works as a helper for no pay (Tr. at 66). Plaintiff's mother owns the in-home day care, and plaintiff is living with her mother (Tr. at 68).

> My mother watches 4 children, aged 1-4. 2 are in diapers. I let them into the daycare in the a.m. and they lay down. If my mother is not up I fix breakfast at 8:30. The children have laid down since arriving until about 8:15. I help them with breakfast. I go outside with them at 10 for an hr. I sit to watch them while outside. I help wash them and get them ready for lunch. After lunch they rest for about 2 hours. After nap they have snacks. I help change the ones in diapers. I watch them at play until their parents come to get them. I am not paid. I am helping my mother because she has had emotional problems since my father died 5/15/05. I leave to go to the dr, run errands, etc. The only physical part is changing the diapers.

(Tr. at 69-70).

**Function Report**

In a Function Report dated July 27, 2005, plaintiff described her daily activities: She gets up at 4:40 a.m. to make coffee and pack her husband's lunch. He leaves for work at 5:20

6

a.m. Plaintiff then waits for the daycare kids to arrive. She spends most of the day watching television, sitting on the computer, or sitting on the porch if the kids are outside. Some nights plaintiff cooks dinner (complete meals), she vacuums once in a while, does laundry, loads and unloads the dishwasher, and mows with a riding lawnmower (Tr. at 73-75). Plaintiff cooks a few times a week, and it takes her 30 minutes to an hour to prepare a meal (Tr. at 75). She reported no changes in her cooking habits due to her impairment: "no pain no gain, do what ya got to do and just do it -- life moves on with or without you." (Tr. at 75). Plaintiff has no problems with personal care (Tr. at 74). She wakes every 1 1/2 to 2 1/2 hours at night when she moves due to back and shoulder pain and foot pain (Tr. at 74). Plaintiff reported that she goes outside "all day and till 10:30 p.m. most, but not all nites [sic]. Have to smoke outside so every 2 to 3 hours I go outside, sit on pourch [sic] and smoke 1 cig and then go back in house." (Tr. at 76). She reported that she drives a car when she goes out and can go out alone (Tr. at 767). She can shop for three hours at a time on average (Tr. at 76).

When asked to describe things she does with other people, plaintiff reported that she chats online with "air people", and spends her days with her family (Tr. at 77). Plaintiff was asked

how far she can walk before needing a rest, and she wrote, "do not like to sit or stand and rest if there will be a lot of walking - harder to start walking again after stopping and resting -- slow + 30 min or so - not really sure" (Tr. at 78). She reported that she can pay attention "as long as I have to" (Tr. at 78). She is able to finish what she starts and she can follow both written and oral instructions "well" (Tr. at 78). When asked how well she handles changes in routine, plaintiff wrote, "OK - have to do what I have to do - that's that, go with the flow not as much stress" (Tr. at 79).

Plaintiff reported that she has lived with daily and constant pain since 1984 but it has gotten worse (Tr. at 80).

**B. *SUMMARY OF MEDICAL RECORDS***

On November 22, 2004, plaintiff established care with Edgar Conrad, D.O. (Tr. at 129). Plaintiff complained of a lot of problems with her left foot on which she had reconstruction done in 1984, and she said she had been crying a lot and was depressed. Plaintiff reported that she was smoking a half a pack of cigarettes per day and occasionally drank alcohol. She was using Exedrin and Tylenol PM a lot. On exam Dr. Conrad found that plaintiff had normal judgement and insight. He diagnosed left foot pain, what appears to read "left arm pain" and depression. He prescribed Symbyax, an antidepressant.

8

On November 24, 2004, plaintiff saw J. Christopher Banwart, M.D., for left foot pain (Tr. at 132-133). Her past medical history listed depression, anemia, and visual problems. Plaintiff was on no medication, and was smoking 1/2 pack of cigarettes per day. On exam, plaintiff was tender with palpation over the left foot. X-rays were taken and Dr. Banwart noted a well-healed left femur fracture and mid-foot left foot post-traumatic arthrosis [joint]. He assessed post-traumatic arthrosis mid-foot joints left foot and chronic left foot pain. He referred plaintiff to Dr. Tim Ogden. "I would not recommend narcotic pain medication for this patient's chronic pain."

On December 7, 2004, plaintiff saw J. Timothy Ogden, M.D., an orthopaedic doctor, for evaluation of her left foot (Tr. at 131). Plaintiff reported that she was in an accident 20 years earlier, had her left femur plated, and her left foot had extensive surgery including pins. "She's had chronic problems with pain in her back, left thigh, and the left foot. She takes over-the-counter medications for this." Plaintiff reported a history of chronic pain, depression, and anemia. She was smoking 1/2 pack of cigarettes per day. On exam, Dr. Ogden noted that plaintiff's left foot is deformed, but her pain was actually in the anterior ankle. X-rays taken by Dr. Banwart on November 24, 2004, showed extensive post-traumatic degenerative change. The

Case 3:08-cv-05022-REL   Document 13   Filed 10/06/08   Page 9 of 31

great toe metatarsal was about 1/3 what it should be.  Dr. Ogden diagnosed traumatic arthropathy [joint disease] in the left foot. Dr. Ogden discussed surgery with plaintiff, told her about the surgery and that her postoperative recovery would take a long time.  "She wants to avoid any type of surgery like this if at all possible."  Dr. Ogden recommended over-the-counter orthotics and "prescriptions were given today"; however, the record does not identify those prescriptions.

There are no medical records covering the next almost eight months.

Plaintiff's alleged onset of disability is June 24, 2005. She completed her application for disability benefits on July 12, 2005.

On July 20, 2005, plaintiff saw Orville Mehaffey, M.D., a family practitioner (Tr. at 136).  The notes state that plaintiff did not get any relief from Ultram.  No exam was performed.  Dr. Mehaffey diagnosed degenerative joint disease of the left foot and lumbar radiculopathy (leg pain caused by lumbar nerve roots). He prescribed Oxycodone (narcotic).  Two days later, plaintiff called and reported that the Oxycodone made her itch all over. The note includes what appears to be a written prescription for Talacin, a synthetic opiate.

10

On August 2, 2005, plaintiff saw Dr. Mehaffey (Tr. at 175). She said she continued to have some pain in her foot and that she had some relief with Talacin. She also complained of back pain. Dr. Mehaffey's exam was limited as follows: "The patient has a markedly scarred, deformed, left foot. The left leg is smaller than the right leg. The patient has muscle spasms in the dorsal region. She is diffusely tender in this region." He assessed chronic left foot pain and dorsal muscle strain. He prescribed Talacin with five refills and Flexeril (muscle relaxer) with five refills.

On September 2, 2005, plaintiff saw Dr. Mehaffey (Tr. at 174-175). She requested help with quitting smoking because her husband had recently had a heart attack and pacemaker placement. Dr. Mehaffey's exam was limited to plaintiff's heart and lungs. He prescribed Wellbutrin and a Nicoderm patch.

On September 20, 2005, plaintiff was examined by Sitaraman Subramanian, M.D., at the request of Disability Determinations (Tr. at 138-142). The chief complaint was listed as "pain in the left leg with difficulty walking. She has a history of automobile accident, reflux disease and tobacco abuse." Plaintiff had a mild cough and mild exertional dyspnea (shortness of breath). Plaintiff reported smoking 1/2 pack of cigarettes per day for the past 30 years. Plaintiff was taking Talacen

11

(also known as Talacin, a synthetic opiate) for pain. On page two of Dr. Subramanian's report, it says "She also complains of chronic back pain. . . . Denies any history of depression". On exam Dr. Subramanian observed that plaintiff walks with a limp favoring the right side. She walked without assistive device. She had decreased range of motion in the left knee and left ankle. Dr. Subramanian's impressions were:

1.   Traumatic arthritis of the left knee and left ankle with pain.

2.   Possible chronic obstructive airway disease.

3.   Tobacco abuse.

4.   Reflux disease.

5.   Painful menstruation.

The reported concluded as follows: "The patient does not seem to have any disability in sitting, standing, handling objects, hearing, speaking or traveling, however, because of the pain in her left leg and ankle pain she may have disability lifting, carrying and walking long distance. She also complains of shortness of breath on exertion."

On September 30, 2005, L. Bobbett completed a Physical Residual Functional Capacity Assessment (Tr. at 89-96). Dr. Bobbett found that plaintiff could lift 20 pounds occasionally and ten pounds frequently, stand or walk for two hours per day;

sit for about six hours per day; and had an unlimited ability to push or pull with hand or foot controls (Tr. at 90).  Dr. Bobbett noted plaintiff's foot deformity and her gait with a noticeable limp.  Dr. Bobbett noted plaintiff has back pain but normal range of motion.  Dr. Bobbett found that plaintiff can occasionally climb, balance, stoop, kneel, crouch, or crawl (Tr. at 91).

On October 3, 2005, C. Kenneth Bowles completed a Psychiatric Review Technique (Tr. at 145-158).  He found that plaintiff's mental impairment, depression, was not severe.  He found that plaintiff had no restriction of activities of daily living; no difficulties in maintaining social functioning; no difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation.  In support of his findings, Dr. Bowles wrote, "Claimant does not allege depression, but medical evidence supports a history of depression with a visit to her physician in 11/04 for depression.  Physician recommended an antidepressant in 11/04.  Claimant does not currently complain of depression.  Physical CE does not show any problems/complaints with depression.  Claimant's ADL's [activities of daily living] show that she assists her mother as necessary with daycare. Claimant is able to carry on household activities and chores, she prepares meals.  Claimant also notes in her ADL's that she is able to follow instructions, gets along well with others and is

able to handle changes fine.  Although claimant has a diagnosis
of depression, her functioning is not impacted significantly by
it.  Therefore, depression is considered non-severe."

On October 4, 2005, plaintiff saw Dr. Mehaffey (Tr. at 174).
She said she did not feel the Talacin was helping her pain.
Under objective, Dr. Mehaffey wrote, "The patient has a markedly
deformed left foot."  He assessed chronic left foot pain and
prescribed Lortab (narcotic) with five refills.  Plaintiff called
in several times after this visit requesting refills of her
Lortab.  In January 2006, the refill was denied and plaintiff was
told she must come in to see the doctor.

On October 6, 2005, plaintiff's application for disability
benefits was denied.

On July 14, 2006, plaintiff saw Dr. Mehaffey (Tr. at 173).
Plaintiff had not seen a treating physician for more than nine
months.  Plaintiff complained of left foot pain and thoracic and
lumbosacral pain.  Dr. Mehaffey observed a markedly deformed and
scarred left ankle and foot, plaintiff's gait involved a stiff
left ankle, she had an exaggerated lordotic curve with
paraspinous muscle spasms, and she had tender points throughout
the spinal column.  He assessed chronic foot pain and
degenerative disc disease of the thoracic and lumbosacral
vertebra.  He prescribed Lortab (narcotic), Lodine (non-steroidal

14

anti-inflammatory), and x-rays of plaintiff's spine.

On July 17, 2006, plaintiff had x-rays taken of her spine
(Tr. at 176-177).  Christopher Meoli, D.O., the radiologist,
found lumbar spondylosis[1] with no acute process and thoracic
spondylosis.

Plaintiff did not see any doctor for the next six months.

On January 3, 2007, plaintiff returned to see Dr. Mehaffey
(Tr. at 173).  She reported no benefit from the Lodine.  She
reported continued severe pain in her left foot.  In addition to
her prescription Lortab (acetaminophen [Tylenol] and hydrocodone
[narcotic]), she was taking Tylenol, Ibuprofen (non-steroidal
anti-inflammatory), and Naproxen (non-steroidal anti-
inflammatory) all together in addition to three Tylenol PM at
night.  Dr. Mehaffey noted plaintiff was getting "toxic doses of
Tylenol".  Plaintiff reported having a lot of problems with
nervousness and depression, she said she cries at anything.  "No
exam today."  Dr. Mehaffey assessed RSD left foot (I have been
unable to determine what "RSD" means).  He prescribed Duragesic
patch (Fentanyl, a narcotic), Roxanol (morphine), and Celexa
(antidepressant).

On February 2, 2007, plaintiff saw Dr. Mehaffey (Tr. at
172).  "The patient is applying for Social Security disability.

_____

[1]Spinal osteoarthritis, degeneration of the spine from wear
and tear.

15

The patient states she cannot stand for any length of time
without having to sit. The patient continues to have severe pain
in her left foot.  The patient occasionally requires Roxanol
[morphine] for breakthrough pain.  This is usually related to her
activity level.  If she does any kind of activity the pain
increases in intensity.  The patient continues to have severe
pain in her mid and low back."  The report says, "No exam today."
Dr. Mehaffey assessed RSD left foot.  He prescribed a Duragesic
patch, which is Fentanyl, a narcotic pain medicine.

Also on February 2, 2007, Dr. Mehaffey completed a Medical
Source Statement - Physical (Tr. at 165-166).  He found that
plaintiff can lift or carry less than five pounds, walk for less
than one hour at a time and for less than one hour all day, sit
for two hours at a time and for two hours all day, and is limited
in her ability to push or pull.  He found that plaintiff can
never climb, balance, stoop, kneel, crouch, or crawl, but that
she can frequently reach, handle, feel, see, speak, and hear.  He
found that she should avoid any exposure to extreme cold, extreme
heat, weather, wetness, humidity, dust, fumes, vibration,
hazards, and heights.  He found that plaintiff needs to lie down
hourly to alleviate pain. He checked "yes" to the question "Does
patient's pain, use of medication, or side effects of medication
cause a decrease in concentration, persistence, or pace, or any

16

other limitations?"  However, his written description is illegible.

On that same day, Dr. Mehaffey completed a Medical Source Statement - Mental (Tr. at 168-169).  He found that plaintiff is markedly limited in the following:

- The ability to carry out detailed instructions

- The ability to maintain attention and concentration for extended periods

- The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances

- The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods

- The ability to accept instructions and respond appropriately to criticism from supervisors

- The ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes

- The ability to respond appropriately to changes in the work setting

- The ability to set realistic goals or make plans independently of others

He found that plaintiff was moderately limited in the following:

- The ability to remember locations and work-like procedures

- The ability to understand and remember very short and simple instructions

- The ability to understand and remember detailed instructions

- The ability to carry out very short and simple instructions

17

- The ability to sustain an ordinary routine without special supervision

- The ability to work in coordination with or proximity to others without being distracted by them

- The ability to make simple work-related decisions

- The ability to interact appropriately with the general public

- The ability to travel in unfamiliar places or use public transportation

Finally, he found no significant limitation in the following:

- The ability to ask simple questions or request assistance

- The ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness

- The ability to be aware of normal hazards and take appropriate precautions

The form asks the doctor to identify which of the following factors support his findings:

(1) Medical history.

(2) Clinical findings (such as the result of physical or mental status examinations).

(3) Laboratory findings (such as blood pressure, x-rays).

(4) Diagnosis (statement of disease or injury based on its signs and symptoms).

(5) Treatment prescribed with response, and prognosis.

Dr. Mehaffey did not mark any of those.

On March 2, 2007, plaintiff saw Dr. Mehaffey (Tr. at 171). She continues to complain of severe pain in her left foot. "Her back continues to ache." Plaintiff reported trouble sleeping. "No exam today." He assessed RDS left foot. He prescribed Roxanol (morphine), Duragesic Patch (Fentanyl, a narcotic pain medicine), and Restoril (for insomnia).

**C.** **_SUMMARY OF TESTIMONY_**

During the March 8, 2007, hearing, plaintiff testified; and Terri Crawford, a vocational expert, testified at the request of the ALJ.

**1.** **Vocational expert testimony.**

Vocational expert Terri Crawford testified at the request of the Administrative Law Judge. The first hypothetical involved a person who could do light work with no climbing or balancing, no working around hazardous conditions, no public contact, and limited coworker interaction (Tr. at 211-212). The vocational expert testified that such a person could work as an electronics assembler, with 83,000 in the country and 1,900 in Missouri (Tr. at 212). At a sedentary level, the person could be a final assembler with 1,400 in Missouri as well as an assembler production with 54,000 in the country and 1,600 in Missouri (Tr. at 212-213).

**2. Plaintiff's testimony.**

Plaintiff testified she lived in a house with her mother and husband (Tr. at 183). Plaintiff's mother runs an in-home day care, and plaintiff helps (Tr. at 183). Plaintiff and her husband had a mobile home until May of 2005 when they moved in with plaintiff's mother (Tr. at 183). Plaintiff's husband works full time and she has health insurance through her husband's employment (Tr. at 184).

Plaintiff has a high school education and four years of college, but she did not get a degree because she did not pass physical science (Tr. at 184-185). Plaintiff has been fired from "quite a few jobs" due to tardiness and failing to lie for her bosses (Tr. at 185-186). Plaintiff's earnings almost tripled from 2003 to 2004 although her alleged onset of disability is June 25, 2004 (Tr. at 187). The ALJ asked plaintiff what was significant about that date. She said, "I don't really know." (Tr. at 187). When confronted with earnings records showing employers' names, plaintiff said, "That was mother, you know. I've been doing stuff for Mother since my kids were born and she went back into daycare for the state. And sometimes she claims paying me and whatever, but --" (Tr. at 188).

Plaintiff said she gets up at 4:30 with her husband, so she is up at 6:00 a.m. when the day care opens (Tr. at 188). She

20

sits in a chair at the computer and waits for people to bring their children in (Tr. at 188). The kids lie down on cots until about 8:30 when plaintiff's mother gets up (Tr. at 188). There are anywhere from seven to 11 children in the day care on any given day (Tr. at 189). Plaintiff cooks the breakfast, she helps put the cots away, and then she takes a nap for an hour and a half until it is time to cook lunch (Tr. at 189, 199). She cooks lunch from 11:00 to 11:30, and then she helps lay the cots back out (Tr. at 189). Plaintiff naps until 3:00 while the kids are napping (Tr. at 189, 199). The kids get up at 3:00 and have a snack (Tr. at 199). Plaintiff helps stack up the cots (Tr. at 199).

Plaintiff testified that the two children in diapers climb up a ladder to the changing table because neither she nor her mother can lift them (Tr. at 189, 199). The children also climb up into their own high chairs (Tr. at 199). The day care closes at 6:00 p.m. (Tr. at 202).

Plaintiff has a driver's license and drives (Tr. at 190). She was still smoking a half a pack of cigarettes per day (Tr. at 190-91). She claimed she had been cutting back, although all the medical records indicate plaintiff had smoked a half a pack of cigarettes per day for 30 years (Tr. at 191). Plaintiff does laundry, she loads and unloads the dishwasher, plaintiff takes

Case 3:08-cv-05022-REL   Document 13   Filed 10/06/08   Page 21 of 31

care of her bedroom, she mows the yard for an hour at a time with
a riding lawnmower (Tr. at 201).  Plaintiff and her mother shop
every week for groceries, and they have to buy all the food for
the day care (Tr. at 202).  Plaintiff's mother gets money from
the state for the food, and her mother also gets Social Security
(Tr. at 202).  When asked if she has any hobbies, plaintiff said,
"Oh, there's a ton of stuff I like, but it all costs money, so,
no, I don't do much." (Tr. at 202).

The ALJ asked what kind of treatment plaintiff had had in
the last five years for arthritis and problems with her leg and
foot (Tr. at 191).  Plaintiff said, "Okay, I have problems
spending money when I have no income, so I have been self-
medicating until I was pretty, pretty much forced to go to a
doctor with, you know, eating six Tylenol PMs to go to sleep, eat
8,000 milligrams of acetaminophen and 8,000 milligrams of the
other stuff, ibuprofen, eat some Naproxens, eat some aspirin, mix
them all up, that's what I've been doing until I was told that if
I don't go [to] a doctor to prove I have an issue, too bad.  So
now it costs me $100 a month to go get my medications from my
doctor because he has to write a prescription every month.  So I
have to get that out of our money that my husband's trying to pay
our bills with from our ex-lives, and now it costs us $100 more
and I can't even bring in $100 to pay for my own doctor and

22

medication." (Tr. at 192). Plaintiff testified that she cannot afford a mental evaluation, nor can she afford an MRI that has been recommended (Tr. at 192). Plaintiff testified that her husband's medication is more important than hers because her husband is the one working (Tr. at 192-193).

Plaintiff testified that her foot does not hurt when she sits (Tr. at 193). But if she sits too long, her back hurts (Tr. at 193). Plaintiff said she could walk for 35 to 40 minutes without stopping because she does it every Saturday when she takes her mother shopping (Tr. at 196). She can only stand still for three minutes at a time (Tr. at 196). When asked how long she could sit, plaintiff said, "Oh, I'm a pretty good sitter." She estimated she could sit in an office-type chair for about an hour (Tr. at 197).

When asked why she could not do a sit-down job, plaintiff said it was because of her shoulders and her back (Tr. at 207). She also said she has "unproclaimed carpal tunnel" or tennis elbow (Tr. at 207). She also has arthritis in her fingers (Tr. at 207). She gets out of breath if she walks up inclines, but she is OK walking on a flat surface (Tr. at 209).

Plaintiff has dealt with depression for 20 years (Tr. at 210). When asked if that causes problems with concentration, plaintiff said, "I try not to concentrate much." (Tr. at 210).

23

When asked if plaintiff has any problems dealing with people, she said, "Not recently." (Tr. at 210). Plaintiff is on an antidepressant but it does not work very well (Tr. at 207). Her doctor told her to give it another month (Tr. at 207). Plaintiff said she sees Dr. Mehaffey every month so he can write her prescriptions, and that costs her $60 (Tr. at 209).

When asked whether she has side effects from her medicine, plaintiff said, "[I] find that when I drive, I have a tendency to -- I just feel though I'm paying to the road, but it's like I don't see, you know. I see it but it's -- I have to go -- I guess I'm spacing off or something, so I've made a better effort when I drive to make sure I'm not just staring at something." (Tr. at 197). Plaintiff said she is tired all the time, but that could be from her depression (Tr. at 198).

The ALJ asked plaintiff if she had anything else to add, and she said:

> I'm not an unskilled worker and when it comes to electronics, I made it to assistant supervisor, so it's really hard to slap somebody back down into an assembly line and be expected to take that wage cut. I don't know why because I've been willing to take a wage cut to go back into that kind of job if they tell me I'm over-qualified. So I don't know how well the unskilled part will work on the --

(Tr. at 215).

At the conclusion of the hearing, plaintiff's counsel requested that the ALJ order a mental evaluation of plaintiff

24

(Tr. at 215-216).  The ALJ said she would think about it (Tr. at 216).  No mental evaluation was ever ordered.

**V.   FINDINGS OF THE ALJ**

Administrative Law Judge Marsha Stroup entered her opinion on April 4, 2007.

Step one.  Plaintiff has not engaged in substantial gainful activity since her alleged onset date (Tr. at 15)

Step two.  Plaintiff suffers from depression and left foot pain with arthritis, impairments which are severe (Tr. at 15).  Plaintiff's alleged carpel tunnel syndrome and back pain are not severe (Tr. at 15).  There is nothing in the file to support an allegation of carpal tunnel syndrome, and x-rays show there is nothing wrong with plaintiff's back (Tr. at 15).

Step three.  Plaintiff's impairments do not meet or equal a listed impairment (Tr. at 15).

Step four.  Plaintiff's subjective complaints are not credible (Tr. at 17).  Plaintiff retains the residual functional capacity to perform sedentary work with no climbing, balancing, or public contact and limited co-worker interaction (Tr. at 16).  With this RFC plaintiff cannot perform her past relevant work (Tr. at 18).

Case 3:08-cv-05022-REL   Document 13   Filed 10/06/08   Page 25 of 31

Step five. Plaintiff is capable of working as a final assembler or a production assembler, both of which exist in significant numbers in the economy (Tr. at 18-19).

## VI. CREDIBILITY OF PLAINTIFF

Plaintiff argues that the ALJ erred in finding that plaintiff's testimony was not credible. Plaintiff points out that the ALJ dedicated only one sentence in the entire order to plaintiff's credibility before dismissing her allegations of pain and frequent crying.

## A. CONSIDERATION OF RELEVANT FACTORS

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts. Rautio v. Bowen, 862 F.2d 176, 178 (8th Cir. 1988); Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints. Gray v. Apfel, 192 F.3d 799, 803 (8th Cir. 1999); McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993). The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions. Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992). If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment

26

unless it is not supported by substantial evidence on the record as a whole. <u>Robinson v. Sullivan</u>, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is not supported by any reasoning in her order. Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ. In determining credibility, consideration must be given to all relevant factors, including plaintiff's prior work record and observations by third parties and treating and examining physicians relating to such matters as plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. <u>Polaski v. Heckler</u>, 739 F.2d 1320, 1322 (8th Cir. 1984). Social Security Ruling 96-7p encompasses the same factors as those enumerated in the <u>Polaski</u> opinion, and additionally states that the following factors should be considered: Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; and any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board).

Case 3:08-cv-05022-REL   Document 13   Filed 10/06/08   Page 27 of 31

The specific reasons listed by the ALJ for discrediting plaintiff's subjective complaints of disability are minimal. Although the ALJ recites the factors of Polaski, she fails to address any of them. The credibility analysis is limited to the following:

> After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible. For instance, the claimant reported that she has dealt with depression since she was run over by a car but medical records from September 2005 demonstrate that she denied any history of depression to Dr. Subramanian.

(Tr. at 17).

The only reason the ALJ discredited plaintiff is because she failed to complain of depression when she was examined by Dr. Subramanian. The ALJ did not address any of the other Polaski factors, nor did she order a mental evaluation to supplement the contradictory record.

I do note that plaintiff's daily activities -- helping to take care of up to 11 children per day, shopping for three hours at a time, doing laundry and cooking, loading and unloading the dishwasher, mowing the lawn -- suggest that she is exaggerating her limitations. In addition, there are lengthy periods of time when plaintiff saw no doctor. Because plaintiff has health insurance, her lack of medical treatment suggests her symptoms

28

are not as severe as she claims.  When plaintiff was asked what was significant about her alleged onset date, she said, "I don't know."  There are no medical records around the time of the alleged onset date.  Plaintiff testified that she had been cutting down on smoking and was down to a half a pack a day.  Yet all of the medical records show that she had been smoking a half a pack a day for years.  When asked if she had any hobbies, she said "no", but the reason was due to the expense, not due to her impairments.  Plaintiff testified that she has carpal tunnel syndrome, tennis elbow, and arthritis in her fingers.  Yet not one medical record includes any of these diagnoses, nor do they include any complaints by plaintiff of any problems with her wrists, elbows, or fingers.  Plaintiff testified at the hearing that she had been in management in electronics, and its would be "really hard" to "slap somebody back down into an assembly line and be expected to take that wage cut", which suggests that plaintiff would rather get government benefits than work for a lower rate of pay than she did in the past.

Although these facts suggest that the ALJ correctly found plaintiff not credible, I cannot assume to know the ALJ's reasoning.  Nor does it account for the years' worth of complaints by plaintiff of leg and back pain and depression including frequent crying spells.  Although the ALJ found

29

plaintiff's depression severe, there was no discussion about how this fit into the credibility determination.

If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment. Here, the ALJ did not give legally sufficient reasons for discrediting plaintiff. Therefore remand is appropriate.

## VII. CONCLUSIONS

In addition to the credibility analysis, the ALJ on remand should order a mental evaluation and resolve the conflict in the record with regard to plaintiff's abilities. For example, plaintiff reported in her administrative paperwork that she can pay attention as long as she has to. Yet her treating physician found that she was markedly limited in her ability to maintain attention and concentration. Dr. Bowles found that plaintiff's depression was not severe, yet he noted that the medical evidence supports a history of depression. Dr. Mehaffey found that plaintiff can walk for less than one hour all day but plaintiff said she could shop for three hours at a time. Dr. Mehaffey found that plaintiff needs to lie down hourly to alleviate pain, yet plaintiff's testimony is that she lies down a total of twice per day. Dr. Mehaffey found that plaintiff is markedly limited in her ability to get along with coworkers or peers, but she

30

testified she has no problem getting along with people.  Dr.
Mehaffey found that plaintiff is moderately limited in her
ability to understand, remember, and carry out very short and
simple instructions, but plaintiff testified that she regularly
cooks meals and that takes 30 to 60 minutes.  She also reported
that she follows instructions "well".  The ALJ found that
plaintiff's back impairment is not severe because x-rays show
there is nothing wrong with plaintiff's back.  However, there is
not one normal x-ray in the record.  The only x-rays of
plaintiff's back show lumbar and thoracic spondylosis.  On
remand, all of these discrepancies must be addressed by the ALJ.

It is

ORDERED that plaintiff's motion for remand is granted.  It
is further

ORDERED that the decision of the Commissioner is reversed
and this case is remanded pursuant to sentence four.

/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
October 6, 2008

31